UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                                      :

STATE OF BADEN-WÜRTTEMBERG,      :
                                        :

          Interpleader Claimant,          :    **No. 04CV10067 (TPG)**
                                        :    **ECF CASE**

          - against -                       :

ROD SHENE,                                   :

          Interpleader Counter-Claimant.    :

--------------------------------------------------------------x

## MEMORANDUM OF LAW OF ROD SHENE IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION THE MOTION OF THE STATE OF BADEN-WÜRTTEMBERG FOR SUMMARY JUDGMENT

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP
John R. Cahill
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Rod Shene*

Date: March 2, 2007

# TABLE OF CONTENTS

*Page*

FACTS ................................................................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................ 4

ARGUMENT ....................................................................................................................... 7

I.      THE GERMAN CLAIMS ARE BARRED BY TREATIES .................................... 7

II.     THE GERMAN CLAIMS ARE BARRED BY CONTRACT ............................... 9

III.    THE GERMAN CLAIMS ARE TIME-BARRED ................................................ 10

IV.   LACHES BARS THE GERMAN CLAIMS ........................................................ 12

V.     ALL GERMAN CLAIMS WERE ABANDONED AND WAIVED .................... 15

VI.   UNCLEAN HANDS BAR THE GERMAN CLAIMS ......................................... 17

VII.  THE GERMAN STATE IS LIABLE IN DAMAGES FOR ITS TORTS ............. 19

VIII. THE GERMAN MOTION SHOULD BE DENIED ............................................. 20

CONCLUSION .................................................................................................................. 23

Rod Shene ("Shene"), by his attorneys, respectfully submits this memorandum of law in support of his motion for summary judgment pursuant to Fed. R. Civ. P. 56 and in opposition to the motion of the State Of Baden-Württemberg (the "German State") for summary judgment.

## FACTS

The facts are detailed in the accompanying Declaration of Rod Shene dated March 2, 2007 and only summarized below.

Shene buys and sells used books in St. Louis, Missouri and is known for his keen eye. Previewing a small auction in the apartment of book dealer Sheldon Margulis (a nominal defendant who is outside the jurisdiction of this Court), Shene spotted original drawings and etchings in what he now knows is the *Augsburger Geschlechterbuch* (the "Book").

After satisfying himself that the Book, like many of his past purchases, had probably been sold off by a now-defunct institution and was not subject to any publicly disclosed claim by any German institution, Shene successfully bid for the Book. To his great good fortune, Shene learned that the Book would be highly valued by collectors in a market that saw few 16th Century Northern European drawings. Sotheby's, in what he believes to be conservative, placed a preliminary estimate of $600,000 on the Book.

That's when Shene's troubles began.

Before then, Shene's research contacts had put him indirectly in touch with a curator of the German State. Without a reservation or so much as a hint of ambiguity, the German State told Shene that it had no claim to—indeed, "no possibility

to claim"— the Book, but wished to buy it and hoped for a "reasonable price." Years before, another bookseller told Shene that this had been his experience with the German State: it had offered to buy another book at what he believed had been a good price. Although the German State was too slow to close the deal, it never sought to know to whom the book had been sold, whether there were any other books, or filed any claim at all.

This was confirmed again when Sotheby's contacted the German State. Responding to the German State's request and advice that it needed to "find funding" in a difficult budgetary environment, Shene, who had borrowed money based on the German State's representations and would have been glad of a quick, certain sale, offered to sell the Book at a discount on Sotheby's estimate and on good terms. But the Book's value apparently was far out of reach for museums of the German State, which have little in the way of acquisition funds are now being asked to *sell* parts of their collections for museum funding.

Funds for legal fees and investigations are apparently not in short supply in the German State and so it retained a leading Washington law firm, a famous historical investigator, and others unknown to build a claim against Shene and recover the Book without paying anything at all. The estate of the previous owner of the Book and others like it had never been hidden and could have easily been discovered long before if the German State had made even the slightest effort. Now long deceased, he was John Doty, a decorated army intelligence officer (a G2 aerial interpreter) who served in Germany with an army division that briefly did battle near one of the 29 facilities where property like the Book was stored during World War II.

Despite what appear to be enormous, expensive efforts, archival plunderings, and wide-ranging interviews, that is pretty much all that is known as *fact*. For the German State, however, it has been enough to allege with the same lack of equivocation that it had "no possibility to claim" against Shene that there is no possibility that seemingly admirable Captain Doty was a lowly thief who stole the Book without the shred of any legal right to it even after 60 years.

Shene too was vilified. Entreaties for a "reasonable price" were replaced by intimidation and threats. And the threats were not idle. While one of life's worst events (his mother's death) played out, the German State geared up to force Shene's capitulation. To the Washington lawyers, German researchers, civil suits, consular officials, and diplomats were added representatives from the Federal *criminal* justice system. In part by blatantly misrepresenting the facts—the "no possibility to claim" communications were not disclosed and prior knowledge by Shene of the Book as "looted art" invented—so that an investigation was begun by the Department of Homeland Security culminating in the issuance of a grand jury subpoena by the Office of the United States Attorney for the Southern District of New York.

The criminal investigation never advanced and this lawsuit proceeded apace. Even as it made absurdly low offers of settlement in a way that is admissible as evidence of the weakness of its claims, the German State refused to mediate or engage in a meaningful settlement dialogue given its vastly superior funds and resources. Long resisting the idea of an expedited resolution, the German State filed its motion at the direction of the Court and Shene now seeks summary judgment as well.

# SUMMARY OF ARGUMENT

Despite the many issues of material fact that cloud the German State's motion, Shene knows of none that ought deprive him of summary judgment for the following reasons, set forth in the order that most easily disposes of all claims:

1. The German State's claims are barred by treaties barring the German State from pursuing claims arising out of the actions of United States soldiers like the former Captain Doty.

2. The German's State's claims are barred by the contract it initiated with Shene, and upon which Shene relied, in which it waived any right it had to make a claim against him and acknowledged German law as controlling.

3. The German State's claims are time-barred under both the 30-year German statute of limitations and New York's, which requires that the demand and refusal that begins the running of the statute not be unreasonably delayed.

4. The doctrine of laches bars the German State's claims because the German State did nothing diligent to seek out the Book and severely prejudiced Shene's ability to defend against the claims.

5. The German State abandoned and waived its claims explicitly in communications with Shene and implicitly by its conduct with respect "war losses" it now claims.

6. The unclean hands of the German State, both in its failure to restitute works of art to victims and their heirs and in its tortuous conduct towards Shene bars its claims.

7. The German State is liable in damages for its tortious acts against Shene, including its defamatory conduct and its abuse of process.

Among the issues of fact that would require further discovery if Shene's motion for summary judgment is denied are:

- The standing of the German State as a "successor" to whatever entity owned the Book at the time of the alleged theft and its rights to both the property of that entity but to bring claims on its behalf;

- How Captain Doty came to possess the Book and whether he did so in a way that bars the claims of the German State;

- Where the Book was located at the time of the alleged theft by Captain Doty, who controlled the area at the time of the alleged debt, and what legal and other actions were taken that would affect title to the Book after that area fell out of German control;

- What information the German State or any entity to which it claims to succeed had about the destruction of property during World War II and the extent to which property had not been destroyed;

- The steps taken by the German State or any entity to which it claims to succeed to search for the Book and other property not seen since World War II;

- How and when the German State learned that Shene had the Book; and

- What damages the German State could have suffered that are not due entirely to its own lack of diligence and express abandonment of its claims.

- What statements and actions were taken by the German State against Shene that can evidence the tort claims asserted against it.

***************

In a law review article written about a dozen years ago known as *A Tale of Two Innocents*, the authors expressed their fears about a then-recent, now seminal case thus:

> The 1991 decision of the New York Court of Appeals—the highest court in the art market capital of the world—in *Solomon R. Guggenheim Foundation v. Lubell* exemplifies this judicial failure to balance the rights of the two innocents. In Guggenheim—an action to recover a stolen painting from a good faith purchaser—the court held that the statute of limitations does not begin to run until the former owner locates, demands, and is refused the return of its property, regardless of the former owner's failure to exercise diligence in locating the stolen work. ***Although the court in Guggenheim expressed a fear that a less "owner-friendly" rule would turn New York into a haven for stolen art, its decision instead threatens to turn New York into a haven for questionable litigation of ancient claims . . . . ***The fundamental flaw in Guggenheim . . . is its failure to consider that it had two "innocents" before

it—the innocent theft victim and the innocent purchaser. Instead, the court absolved the former owner, as a matter of law, of any duty of diligence under the applicable statute of limitations [FN12] to attempt to locate its missing art. [FN13] The court harshly treated the innocent purchaser as worse than the thief . . . .

Ashton Hawkins, Richard A. Rothman, & David B. Goldstein, A TALE OF TWO INNOCENTS: CREATING AN EQUITABLE BALANCE BETWEEN THE RIGHTS FORMER OWNERS AND GOOD FAITH PURCHASERS OF STOLEN ART, 64 Fordham L. Rev. 49, 51 - 52 (October 1995).

The German State has proved the authors' fears and then some. Before this Court now are claims arising out of the German State's own horrific conduct during World War II. The claims it presses are not just "questionable"—there really is no question that the German State expressly and in writing stated that it would not pursue the very claim for possession that it pursues here—they turn the notion of justice inside out.

More than 60 years after the war ended, in defeat and with treaties, the German State comes to this Court with claims that it would not hear in its own courts even as it flatly refuses to accept the jurisdiction of our courts with respect to its most horrible acts. *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1177 (D.C. Cir. 1994) (honoring German refusal to submit to jurisdiction over claims brought by a United States citizen arising out of slave labor he was forced to perform as a child in Germany camps, all following "Germany's unequivocal refusal to enter into any settlement with [him]").

For his part, he would have been better off taking the Book to Germany where claims like the German State's are ignored by the German State itself. Indeed, it ignored this claim for decades and decades as well, until it discovered the Book's value. But that and its vaunted resources should not be enough to prevail against Shene, who simply bought a used book at an auction.

The openness of our courts and an increasing, entirely justified societal sympathy for victims of Germany during World War II should not be spread out as a welcome mat for specious claims that the German State wishes to revive after long abandonment and agreeing with Shene would not be pursued. Shene has already been treated worse than the thief—even though there is not nearly enough evidence to affix that label to the deceased Captain Doty.

The Court is respectfully urged to deny the German State's motion, to grant Shene's, and convene appropriate proceedings to assess damages against the German State.

## ARGUMENT

As set forth below, there is no genuine issue of material fact that ought to preclude an award of summary judgment against the German State on all claims asserted by it and those asserted by Shene against it.

## I. THE GERMAN CLAIMS ARE BARRED BY TREATIES

At the Settlement Convention signed at the Yalta Conference, Germany and its nationals waived its right to pursue claims against other countries and their nationals. The relevant portion of the Convention reads thus:

CHAPTER NINE

CLAIMS AGAINST FOREIGN NATIONS OR NATIONALS

Article 1

Without prejudice to the terms of a peace settlement with Germany, German nationals who are subject to the jurisdiction of the Federal Republic shall not assert against countries which have signed or acceded to the United Nations Declaration of 1 January 1942, or have been at war with Germany, or are specified in Article 5 of Chapter Five of the present Convention, or against the nationals of such countries, claims of any description arising out of actions taken or authorized by the Governments of these countries between 1 September 1939 and 5 June 1945 because of the existence of a state of war in Europe, nor shall such claims be asserted in any court of the Federal Republic by any person.

*Settlement Convention Signed at Yalta*, Art. 1, October 28, 1954, 6 U.S.T. 4411,

OT.I.A.S. No. 3425 .

Although the treaty was not applied because of the bailment that had been created with respect to the Hitler-painted watercolors at issue, there is no dispute as a matter of law that "Germany was empowered to waive the claims of its nationals." *Price v. U.S.*, 707 F. Supp. 1465, 1470 (S.D. Tex. 1989). Indeed, the Court held that "[h]ad the paintings and archives been pillaged in 1945 with no manifestation of an intent to return them, the defendant's immunity defense would be sustained." *Id.*

It seems inconceivable that those involved in making the peace contemplated that entities like the German State would be permitted to use United States courts to sue soldiers or their successors in interest over disputes involving war souvenirs. Shene should not be subject to such claims based on speculation over wrongdoing by Captain Doty.

## II.    THE GERMAN CLAIMS ARE BARRED BY CONTRACT

Although it is not written, the German State induced Shene to enter into a binding agreement.  The German State confirmed that it had no claim against him and Shene sealed the agreement by borrowing funds in reliance (Shene Dec. ¶ 49) and agreeing to openly negotiate with the German State for a "reasonable price."  (*Id.* ¶ 40: Exhibits Q, R, and S).

Such contracts can plainly be formed and are enforceable:

> It is well settled under New York law that although there is no written contract between two parties, "a contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *In the Matter of Boice*, 226 A.D.2d 908, 910, 640 N.Y.S.2d 681 (3d Dep't.1996); *see also Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-504, 369 N.Y.S.2d 400, 330 N.E.2d 414 (1975); *Miller v. Schloss*, 218 N.Y. 400, 406, 113 N.E. 337 (1916). An implied-in-fact contract is "just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Jemzura*, 36 N.Y.2d at 504, 330 N.E.2d 414, 369 N.Y.S.2d 400; *see also Miller*, 218 N.Y. at 406, 113 N.E. 337 (implied-in-fact contracts are "true contracts").

*Ellis v. Provident Life & Accident Ins. Co.*, 3 F.Supp.2d 399, 409 (S.D.N.Y. 1998).

To allow the German State to renege on its promise like a schoolchild who takes its ball back once it has what it wants would violate the contract and be manifestly unjust.  The German State should, at least with respect to the statute of limitations which it mentioned in making the contract, be held to its agreement, which clearly contemplates the application of German, not New York, law.  *Cf. Texaco A/S v. Commercial Ins. Co.*, 160 F.3d 124, 128 (2d Cir.1998) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122

F.3d 130, 134 (2d Cir.1997)) ("[w]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.")

The German State's offers refer repeatedly to German law (*e.g.*, Exhibit Q) and the "law shopping" now engaged in should not be tolerated.

## III.  THE GERMAN CLAIMS ARE TIME-BARRED

It is indisputable that the German claims are time-barred as a matter of German law.  Surprisingly, there is no German judicial decision on the German statute of limitations as applied to "stolen" art, but the German State was quite correct in confirming to Shene that the German State had "no possibility" to make claims against him.  The only judicial decision, which is quite lengthy, is *City of Gotha and Federal Republic of Germany v. Sotheby's and Cobert Finance S.A*, Case No. 1993 C-3428 (Royal Courts of Justice, London  September 9, 1998).  We have reproduce and efile only the relevant portion below, but shall serve and file a complete copy of the decision, which is also online (from whence this excerpt comes) at:

http://www.iuscomp.org/gla/judgments/foreign/gotha1.htm

> *In spite of its age (almost exactly one hundred years) and obvious relevance to the recovery of stolen art, not a single decision by any German court on this provision seems to have been reported. Thus, a decision by the High Court of England and Wales, which includes a full discussion of German academic writing on the subject, becomes the first judicial authority on a section of this venerable codification of Civil Law.*

### II.3 Limitation Under German Law.

I have had evidence on this issue from Professor Siehr on behalf of the plaintiffs and from Professor Brunner on behalf of Cobert. The following propositions of German law are not in dispute:-

i. The right to recovery is statute barred after a period of thirty years (Article 195 of the "BGB").

ii. No title is transferred to the person in possession by the expiry of the limitation period of thirty years.

iii. The limitation period begins when the claim arises ( Article 198 BGB ).

iv. The thirty year period continued to apply even when the painting was outside Germany within the Soviet Union.

v. Time runs irrespective of whether the claimant is aware of the existence of the claim or the identity of his opponent.

vi. A new claim for recovery arises against each new possessor. It follows from that proposition that a new thirty year limitation period began to run each time the picture changed hands. But a succeeding possessor can take advantage of the period of time which elapsed while his predecessor was in possession pursuant to Article 221.

As for New York law, for purposes of this motion, we do not take issue with this summary by the lead attorney for the German State:

> The largest U.S. art market, New York, applies a different analysis, known as the "demand and refusal" rule. That rule holds that the statute of limitations period does not begin to run until the theft victim demands that the current possessor return the property and the possessor refuses. [*See Solomon R. Guggenheim Found. v. Lubell*, 567 N.Y.S.2d 623, 626, 77 N.Y.2d 311, 317 (N.Y. 1991).] Even then, however, a theft victim who knows the identity of the possessor of its property cannot unreasonably delay making his demand for the return of the property [*Id.*] Furthermore, even if the statute of limitations is satisfied [*Hoelzer v. City of Stamford*, 933 F.2d 1131, 1137 (2d Cir. 1991).]

Thomas R. Kline, *Recovering Wartime Losses and Other Stolen Art and Cultural Property Found in the United States*, THE SPOILS OF WAR INTERNATIONAL NEWSLETTER, December 11, 1996 (Shene Dec., Exhibit M).

Laches is addressed in the next section. Should the Court apply New York law with respect to the statute of limitations, the only factual issue to consider is whether the German State engaged in "unreasonable delay." The German State, over his counsel's objections called Shene and, therefore, knew his name and, at least, his telephone number. (Shene Dec. ¶43.) When the German State learned that and how is an issue of fact; there was a refusal to disclose that information before the case and no documents were produced by the German State that supplies the information. (*Id.*) If, by way of example, Shene was identified by the Metropolitan Museum of Art at the time of the German State's first contact with Shene, the delay would amount to years and could well be unreasonable as a matter of law. *Lubell*, 153 A.D.2d at 148, 550 N.Y.S.2d at 621.

## IV.    LACHES BARS THE GERMAN CLAIMS

As the German State's counsel explained in the article cited above, laches is an equitable doctrine with two prongs that must be satisfied (a) lack of diligence in searching for "stolen" property and (b) prejudice to the holder of the property. Unreasonable delay, while often indicative of a lack of diligence and a cause of prejudice is not, by itself, required. *Id.* at 149, 550 N.Y.S.2d at 621.

The lack of diligence of the German State for over 60 years and the prejudice it caused is overwhelming. The German State argues that this case is "in the

mold" of other stolen art cases," *Moving Memorandum of the German State*, dated

January 24, 2007 ("German Mem.") at 1. It is in the mold of certain art cases, but

certainly not those cited by the German State. By way of example, consider this

description of the Weimar museum's actions following a theft:

> Their disappearance coincided with the withdrawal of the
> temporary American occupation forces which were
> replaced by the Russian Army on July 2, 1945.[FN8] Dr.
> Scheidig, the Director of the Weimar Museum from 1940
> to 1967, who discovered the theft on an inspection of the
> castle, immediately reported the theft and thereafter
> engaged in diligent efforts to locate the paintings. These
> efforts included contacting various German museums and
> administrative organs, the Allied Control Council, the
> Soviet Military Administration, the United States State
> Department, and the Fogg and Germanic museums at
> Harvard (which were active in locating stolen art), all to no
> avail.

*Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1156 (2d Cir. 1982); *see also*

*Menzel v. List*, 49 Misc.2d 300, 301, 267 N.Y.S.2d 804, 807 (N.Y. Sup. Ct. 1966)

("[s]earch had been made by Mr. and Mrs. Menzel for the painting ever since the end of

the war [i.e., for at least 17 years], but they were unable to locate it"); *Autocephalous*

*Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts Inc.*, 717 F.Supp.

1374, 1380 (S.D. Ind.1989) ("[i]mmediately" . . . contacted UNESCO . . . notified several

people and entities whom it believed could assist . . . continued to meet . . .. notified the

International Council . . . British Museum and the Louvre, and . . . Christie's and

Sotheby's . . .", etc.).

The German State does not, and cannot, point to anything like the

"immediate" reporting, wide agency contact, and international museum searches. Indeed,

it produces evidence of nothing with respect to the Book, offering as an excuse that they thought it was "burnt" without explaining what efforts, if any, underlay that judgment. No registry listings were filed, no museum, dealer or auction contacts were made, and no effort was made to post information on the Internet. Shene Dec. ¶¶ 23, 26, 28. So indifferent was the German State that when Mr. Hirschfeld posted a book on eBay six years ago, they could not be bothered to ask him where he got and if there might be any more. Shene Dec. ¶¶ 34-37.

Thus, the German State is far more "in the mold" of a growing line of cases, dismissed at a similarly early stage of the proceedings, in which claimants that did nothing got nothing. *Stuart & Sons, L.P. v. Curtis Pub. Co., Inc.,* 456 F.Supp.2d 336, 348 (D. Conn. 2006); *In re Peters,* 34 A.D.3d 29, 821 N.Y.S.2d 61 (1st Dep't 2006); *Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.,* 300 A.D.2d 117, 752 N.Y.S.2d 295 (1st Dep't 2002); *Sanchez v. Trustees of the University of Pennsylvania* , 2005 WL 94847, (S.D.N.Y. 2004).

The court in *Sanchez,* for example, made it plain that lack of resources (although the German State can hardly complain of that) will not excuse lack of diligence:

> Plaintiffs argue that Luis' trivial efforts were nonetheless legally sufficient given Luis' and the other plaintiffs' income and education level. None of the siblings has any post-secondary education, and Luis never made more than $ 28,000 per year. Sanchez Aff. ¶¶ 4, 13. But how much money or education does it take to write letters, do a little research in the relevant literature, ask a librarian at the New York Public Library (whose main branch is close to Luis' apartment) to help do such research, or, in more recent years, do an internet search? The desultory efforts Sanchez engaged in between 1970 and the present are not remotely

enough to satisfy the requirements of a diligent search.

*Id.* at 3.

"Desultory" is a description that can be equally applied to the German State's efforts to recover the Book and objects like it. The prejudice that it caused is similar to that suffered by innocent purchasers like Shene in all of these cases: (a) the death of witnesses (*e.g.*, Captain Doty, who is the one person who really knows what happened), documents (such as war souvenir authorizations or other documents relating to the Book), and witnesses with knowledge of the governance, "burning," and "plundering" of the Waldenburg Castle and area (Shene Dec. ¶¶ 18-21, Exhibits J, K, and L). As the referenced exhibit shows, there are at least some people who believe that property was "plundered"—and "plundered" property can be diligently searched for—unlike that which is "burnt."

As in *Wertheimer*, the "lack of due diligence . . . substantially prejudiced" Shene "by making it virtually impossible . . . to prove that any of [his ]predecessors in interest acquired good title (*see Greek Orthodox Patriarchate of Jerusalem v. Christie's Inc.,* 1999 WL 673347, *10-11, 1999 U.S. Dist LEXIS 13257, *33 [S.D.N.Y., Aug. 30, 1999] )." *Id.* at 118, 752 N.Y.S.2d at 296.


## V.     ALL GERMAN CLAIMS WERE ABANDONED AND WAIVED

While claimants like the Menzels, who fled invading Germans, cannot reasonably be said to have abandoned their property, the German State did exactly that after World War II with respect to the Book. In *Menzel*, "[a]bandonment is defined as a voluntary relinquishment of a known right." 49 Misc.2d at 305, 267 N.Y.S.2d at 804.

The German State could hardly have been unaware of its rights and yet it volunteered to Shene that it would not pursue him consistent with German law. Shene Dec. ¶¶ 37, 38, and 40, Exhibits Q and R.

Waiver is, according to lone-established law, "essentially a matter of intention," a matter for the trier of fact. *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37 (1917); *see also In re Caldor, Inc.*, 217 B.R. 121, 133 (Bankr.S.D.N.Y.1998) (waiver is "generally ill-suited for summary adjudication"); *Edrei v. Copenhagen Handelsbank A/S*, No. 90 Civ. 1860, 1991 WL 64201, at *11 (S.D.N.Y. Apr. 19, 1991). Shene respectfully submit that the clear, written, and repeated language of the waivers (Shene, *e.g.*, Exhibits Q and R) coupled with conduct that cannot be explained except by an abandonment of the claims, *e.g.*, not asking follow-up questions to dealers like Mr. Hirschfeld when actually found with lost property (Shene Dec. ¶¶ 33-36, Exhibit P), leaves no room for confusion about the German State's intentions: it had given up any claims to the property in the hope of buying it back. Waiver is "essentially a matter of intention", *see Alsens*, 222 N.Y. at 37, and is thus most commonly "proved through declarations, acts and nonfeasance which permit different inferences to be drawn and 'do not directly, unmistakably or unequivocally establish it." *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir.1983) (internal citations omitted).

On some very base level, one can understand the German State's revisiting such decisions with hindsight especially when so much money is at stake (and your museum has so little). An important New York State Appellate decision put it this way

when describing a man who did not claim conversion when his agent sold his painting without authorization:

> While it might be plausible to regard Paul Glaser's sale of the painting as an act of conversion, it is clear that Professor Glaser did not treat it as such. Though he had contemporaneous knowledge of the disposition of the painting and the identity of the person who possessed it, the Professor failed to report a theft and, indeed, did not regard the painting as having been stolen. His attempt to repurchase the painting, rather than demand its return- whether from Otten, Galerie Hermann Abels or some unknown third party is tantamount to a concession of the possessor's rightful ownership.

*In re Peters,* 34 A.D.3d 29, 35, 821 N.Y.S.2d 61,66 - 67 (1st Dep't 2006).

Recall that, even when the Book was at Sotheby's, the German State was offering *to buy* the Book and, more than once, sought time to "find funding." Shene Dec. ¶40, Exhibits R and S. Having done so, however displeased they may be with the benefit of hindsight, the German State should not be permitted to press its claims.


## VI. UNCLEAN HANDS BAR THE GERMAN CLAIMS

One of the most familiar equitable maxims is that one who comes into equity must come with clean hands. The maxim is more than a mere banality; it is the underpinning of the doctrine of unclean hands, which may be an absolute bar to recovery.

> The Supreme Court has described the doctrine as an "ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."

Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814 (1945).

Here, the German State is guilty of engaging in the same practices they allege took place here. As detailed extensively in the Shene Dec. ¶¶ 9-12, Exhibits G-I, and other German museums and institutions have works of art and other claims that are pressed by those far more deserving of relief.

In addition, the German State has intentionally caused Shene to suffer extensive and unnecessary pain and costs in an effort to force him to capitulate. The tactics have ranged from trick telephone calls to misrepresenting information to Federal law enforcement officials bring the pressure of a criminal investigation to bear on him. Shene Dec. ¶¶ 42-50, Exhibit 5. It is, given the nature and extent of the German State's conduct, not without irony that one of the German State's attorneys has written:

> Within the context of settlement negotiation, a theft victim may mention that he has the option of instituting legal proceedings to recover the art. However, a theft victim should be careful not to threaten the possessor with taking legal action or the possessor could accuse the theft victim of the crimes of duress or extortion.

Thomas R. Kline, *Recovering Wartime Losses and Other Stolen Art and Cultural Property Found in the United States*, THE SPOILS OF WAR INTERNATIONAL NEWSLETTER, December 11, 1996, n.12 (Shene Dec., Exhibit M).

Under the unclean hands doctrine, this Court should exercise its wide-ranging discretion and refuse to aid the unclean litigant. This is true even for those who, unlike Shene, are not innocent purchasers. *See, e.g., Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F.Supp. 73 (S.D.N.Y. 1980) (where plaintiff was guilty of the same

deceptive trade practices of which it accused its competitor, plaintiff could not secure equitable relief simply because defendants' hands might be a shade or two less clean).

## VII.   THE GERMAN STATE IS LIABLE IN DAMAGES FOR ITS TORTS

Shene has also brought claims arising out of the German State's tortious conduct that are independent of his claims to quiet title to the Book. See the Fourth and Fifth Causes of Action in Shene's Answer, Cross-Claims, and Third-Party Claims in the Alternative dated March 7, 2005.  Kline Dec., Exhibit 2.

### A.    Injurious Falsehoods

Shene has detailed false statements that were published to the government and the media, accompanied by statements of actual malice by those acting on behalf of the German State.   Shene Dec. ¶¶ 42-50, Exhibit V.   At a hearing or inquest, Shene is prepared to offer into evidence the damages that he suffered in the form of his loan losses, attorneys' fees relating to the criminal investigation against him, serious mental and emotional harm, and lost revenue arising out of the statements made to him. Judgment is respectfully requested on liability so that a proceeding may be held where testimony and documents can be introduced in proof of special damages. *See, e.g.*, *See Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960) ("the elements of a claim of injurious falsehood or trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages").

B.      Abuse of Process

Shene has detailed the conduct giving rise to this claim, which includes the instigation of a criminal investigation on a grand jury subpoena based on false representations. Shene Dec. ¶¶ 42-50, Exhibit V. Sotheby's had already agreed to hold the Book pending the resolution of this dispute (Kline Dec., Exhibit 4) when the German State was pushing for a criminal investigation nonetheless. That was clearly done for the improper purpose of forcing Shene to capitulate and it caused real emotional and financial damage. *See, e.g., Parkin v. Cornell University, Inc.*, 78 N.Y.2d 523, 530, 577 N.Y.S.2d 227, 230 (N.Y. 1991) ("both plaintiffs testified that they had incurred legal expenses in connection with their defense of the criminal charges brought against them"). That alone is sufficient to plead special damages. Shene has also raised other troubling matters related to this case, Shene Dec. ¶¶ 35-36, Exhibit P, and believes, at the very least, that they carry evidentiary weight favoring his claims of abuse of process. *See, e.g., Honzawa v. Honzawa,* 268 A.D.2d 327, *331, 701 N.Y.S.2d 411 (1st Dept. 2000).

The German State has not addressed any of these claims in its motion and may therefore be presumed to have no evidentiary basis for opposing them.

## VIII. THE GERMAN MOTION SHOULD BE DENIED

The German State did not address any of the affirmative defenses in its motion papers and should accordingly, as a procedural matter, should be barred from doing so on reply. *See Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244,

269 (S.D.N.Y.1992) (criticizing litigant's decision to raise new issues and arguments for the first time in reply brief).

Disputed matters of fact preclude granting the German State summary judgment.[1] The many factual issues that would require discovery and a trial are detailed in the Shene Dec., and include, by way of example, (a) issues relating to the German State's claim to have succeeded to the claims of the unnamed entity that owned the Book before World War II, (b) the legal status of such entity and of the Book at the time it is alleged that Captain Doty "stole" it, and (c) the circumstances and legal effect of his taking possession, if at all during World War II. The German State's submitted declarations themselves conflict as to when Captain Doty took possession; compare, *e.g.*, the inadmissible hearsay in Kline Dec., Exhibit 12, ¶ 10, with the inadmissible hearsay in Kline Dec., Exhibit 18, ¶ 4.

Although we think that the German State has offered no admissible evidence to counter our claims and affirmative defense, if the Court indulges the German State with permission to do so on reply and credits any of its arguments, there could be factual issues relating to, by way of example, (i) the basis for any belief that the Book was burned, (ii) the length of the delay that the German State engaged in before bringing

---

[1] *Stuart & Sons, L.P. v. Curtis Pub. Co., Inc.*, 456 F.Supp.2d 336, *342 (D.Conn.,2006) ("The movant's burden does not shift when cross-motions for summary judgment are before the court; rather, each motion must be judged on its own merits." Indeed, "[c]ross motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified....") (internal citations omitted).

suit, and (iii) the absence of any evidence to support the German State's claim for damages.

## CONCLUSION

The Court is respectfully urged to deny the German State's motion, to

grant Shene's, and convene appropriate proceedings to assess damages against the

German State.

Dated:   New York, New York
        March 2, 2007

                      Respectfully submitted,

                      FRIEDMAN KAPLAN SEILER &
                        ADELMAN LLP

                      John R. Cahill (JC-429()
                      1633 Broadway
                      New York, NY 10019-6708
                      (212) 833-1100

                      *Attorneys for Rod Shene*